May it please the court. Again, my name is David Cincinnig with Fern Park Cincinnig. We represent the appellant plaintiff Camille Sedar and on behalf of ourselves and Ms. Sedar, I would like to thank you for your time and attention to this case. This is a de novo review of an order from the district court granting the defendant's motion for summary judgment. It is a negligence case. It is a trip and fall case, so it presents standards that are pretty well established, I think, and pretty well known. The three issues on the case are whether a dangerous condition existed, whether that condition was the proximate cause of Ms. Sedar's fall and subsequent injuries, and whether or not the defendants had notice. So these are issues that arise a lot in these cases. What I'd like to do first is just briefly walk through some of the evidence. I think when you take a look at what happened that day, it shows that Ms. Sedar has checked the boxes on presenting evidence sufficient to overcome the motion for summary judgment. Ms. Sedar was traveling with two co-workers. They were going to a lunch for another co-worker who's being deployed overseas. She drove, so they witnessed her driving there. She parked in what is the green garage, which is just outside of Reston Town Center, where they were going to eat. She parked the car, she got out of the car, she walked through the garage, and she negotiated stares within the garage. There's some facts irrelevant to the defendant's argument, Appleby's argument, that there may have been other probable causes. The witnesses both testified, Ms. Buchanan and Mr. Rapunov, that they didn't notice anything odd or unusual about her driving, about her walking, about her negotiating the stares. As she exited the garage, they both testified that they were walking directly behind her, that she was not distracted at all, she was looking forward, she was not talking with them, they were talking between themselves, she was not on her phone, and there were many other things in the record showing that she was simply walking forward without distraction. The witnesses testified that suddenly, they both testified, that suddenly she disappeared from view. Mr. Rapunov testified that he heard something audible. She was carrying a poster board that she had been carrying through the garage and up the other stairs. He saw that flying through the This is Judge Qualabong. If I could stop you there, and maybe it's about that point in the evidence I have a question about. Do you have a theory as to where on the stairwell, and by where, I mean left, middle, right, she was, or is your theory she could have been in the middle or the So, you know, please explain that. Yes, Judge Qualabong, I appreciate you bringing that up. As you're facing down the stairs, it would be the far right stairwell, and you can see that in photographs that were taken immediately after the incident, and the photographs not only show the defective and dangerous condition at the top of the stairs, they show bloodstains that line up at the bottom of the stairs, they show a wall off to the right demonstrating that it was that right hand as you're looking down. In addition, Your Honor, you have the testimony of Ms. Buchanan, who was walking directly behind her. Her testimony is, I saw her disappear from view. We would characterize that as she saw her fall. Now, there is no question that she did not, nor did Mr. Appenaut, actually see her foot on the bricks, but she saw her fall. She said, I looked down from where she had fallen, and I saw the loose bricks and the condition that she described. Ms. Buchanan also says she went around that to go tend to Ms. Cedar. She got to the bottom of the stairs. She tended to Ms. Cedar. Emergency personnel showed up. She went directly back up that same stairwell to view the dangerous condition that was subsequently photographed, and she identified those photographs. So let me, just just for, maybe it depends on which way you're looking as to whether you say right or left. It looked like from the deposition testimony that Mr. Rappanut said the left, and maybe that's your, and then I saw the, Mr. Holland says the western side. So, and I recognize everything's not necessarily neat and perfect, but is when when Mr. Rappanut is saying left, is that the area that you just described, or is that the other side? And your honor, there was during depositions, what took place well over two years after the incident, there was some back and forth on which one it was in. In the end, I think you'll find what the testimony is. Both of them confirmed that it was, as you're looking down, that that that right stairwell. But you need not, and again, any conflict in the evidence at this stage would have to be resolved in our favor. And I think the evidence is very clear when you look at the photographs that were taken immediately after the incident, that everybody was in line as to where the incident occurred. Again, Ms. Buchanan's testimony, I looked immediately down, I went down, I came immediately back up. The photographs show the bloodstain at bottom of the steps where they took the photographs. There's actually also, Judge Quattlebaum, photographs where you can see what appear to be emergency personnel in that same stairwell. The pictures do not show Ms. Cedar at the bottom, which was probably tasteful, but they show an individual with a walkie-talkie standing there. They show an individual kneeling at the bottom, where you can later see the bloodstain, and they show the defective condition. So I submit to you, Your Honor, that while there was some testimony that was corrected during depositions, everybody agreed at the time where the incident happened, and on that day, there was no question in their minds where it happened. And that is... Mr. Cincinnati, let me ask you this question. Yes, sir. In terms of proximate cause, we normally tell juries proximate cause is the most efficient cause, but there can be more than one proximate cause. Does it matter in this case whether or not it was a loose brick or a gap in the caulking? It does not matter which one it was, Your Honor. There's testimony from the expert and also Ms. Buchanan's testimony about the overall condition of the lip and of the bricks. There's also testimony regarding notice from Mr. Schwartz and the expert, Mr. Holland, about the bricks and the caulking in the lip having been sagging. Judge Floyd, I appreciate you bringing up the other probable causes. I wanted to get to that. Obviously, proximate cause can be determined by circumstantial evidence. We have very strong circumstantial evidence here from the photographs, from Ms. Buchanan's testimony, from Mr. Rapinoe's testimony, from the video, and we also have expert testimony to get over the hump on the proximate cause issue. I would like to point out that the appellee in their brief and to the district court does try to postulate other probable causes that may have happened. If you'll note in their briefs, they do not cite to any part of the record for any of those causes. They reference the fact that the sun may have been in their eyes. It was a bright day, but there's absolutely no evidence that the sun was directly at them or that it was in their eyes. Basically, we would submit to your honors that... You don't care if they're... I mean, you'd probably rather have no evidence of it, but even if there is evidence, you would say that's for the jury to ferret out, wouldn't you? And thank you, Judge Quattlebaum. That's absolutely right. The cases very clearly say that it is not incumbent upon the plaintiff to rule out any other probable causes, and the cases that we've cited to basically say that if it's a close call, it should go to the evidence. The evidence I think you mentioned was the testimony of Schwartz. Put that aside because reading that in total, I'm not going to debate with you, but I think that may not be as strong as your other evidence there. I think your other evidence you say is Holland and his testimony that it was progressive and would have been visible. Is that right? That's correct. Actually, Judge Quattlebaum goes beyond that. What he says was based on his opinion and experience, it would have existed for at least several months. He really captures it in two different ways. So he captures the timeframe there by saying at least several months, and then he also opines that given that, it is a condition that should have been seen upon reasonable inspection. I'd also like to point out that what we argue on our brief regarding inspection, they really didn't have any procedures in place for inspection, which buys into that notice as well. You can't stick your head in the sand and then say, I didn't notice anything, and that is also brief. But I submit to you, Your Honor, that the expert testimony that's presented in this case is exactly what you have to have in this case when you have this type of notice. It takes it out of the cases where the grape or the bottle or whatever is on the floor and there's no videotape. At least several months is clearly something that a reasonable jury could find is sufficient to show that at a Reston Town Center should have noticed it had they conducted reasonable inspection. And the district court has not ruled on the Dahlberg motions that I could see. Is that right? That's correct, Your Honor. They have not ruled. Was there a motion on this notice issue? I know there was a motion about the opinion of the existence of a danger, whether that was something that you needed an expert for, whether it's something that a layperson could understand themselves. Was there a challenge to the move to exclude all the testimony? Obviously, we believe that and feel that it's perfectly appropriate. But for the purposes of this case today, that has not been excluded. It was still in the case when the district court ruled. It's still in the case now. Mr. Cincinnati, let me ask you this. With regard to your negligence per se claim, can you cite to a building code violation? We do, Judge Floyd, yes. Our expert, Mr. Holland, notes the applicable building code violations, which basically say that even slight defects at the top of the stairs at a point of egress can be a violation of that code. And it goes to not only the negligence per se, which I submit to you has very clearly been shown through Mr. Holland's testimony, Judge Quattlebaum, to your notice issue. I'd also note for the court that under a negligence per se standard, notice is not a required, is not an element of that. It's simply a violation of a code that was for the safety of the persons. And in this case, it certainly was. When you're talking about a defect at the top of the stairs and the fact that even a slight defect at that point is a violation. In Virginia, is your client characterized as a property characterized as an invitee? Yes, Judge King, she would be considered an invitee on private. This is an invitee on the property. It leads to the cases that they discussed regarding municipal sidewalks. I submit to you that there are a couple things there. Number one, it's an invitee versus municipality. Jury instructions do vary slightly on that. They both talk about ordinary care and what is reasonable under the circumstances. But an invitee jury instruction does state that it is for the purpose of the invitation. I think that could be material in this point because one of the arguments that the defendants have made is that she was carrying a poster or folder. I think it's perfectly reasonable for the owner and operator of a town center that has shops to anticipate that somebody may be carrying something as they go through there. I'd also note that the case cited by the defendant's Medical Center Hospital versus Sharpless, the Virginia Supreme Court, also cautioned against using the same jury instructions for a municipality case versus an invitee case. The court noted in the Sharpless case that both sides had argued sidewalk cases and the plaintiff had not objected to that jury instruction. So therefore, it just ruled on what it had before. I see my time is up. If there aren't any more questions, I reserve the rest for my reply. Thank you. Thank you, Your Honor. Thank you, sir. Mr. Huggins, I'm sorry I mispronounced your name. Huggins, thank you, Your Honor, and good afternoon. Good to have you with us, sir. Thank you. It's my pleasure to be arguing on behalf of Reston Town Center Property LLC and Austin Properties Limited Partnership, the Appalese. If I can, I'd like to cut right to the chase. This is a very simple trip or slip and fall case. Very simple. The case law is not that complicated. And so really, it comes down to analyzing the facts to determine whether or not there are missing elements from the plaintiff's claim or not. There were only two individuals who were with Ms. Cedar at the time that she was, you know, leaving the Green Garage and on her way to the luncheon with her work colleagues. And that's Mr. Rappanut and Ms. Buchanan. And if you read the deposition testimony of Ms. Buchanan, she was a little confused about whether or not the path of travel was on the right-hand side or whether it was in the middle. She was very clear in her testimony that it was in the middle, in the middle, in the middle. And then we took a break at her deposition and she came back and changed her testimony. But she didn't see what Ms. Cedar may have tripped over, if she tripped at all. She had no idea. She just said that she was walking behind her on their way out of the garage. And then the next thing she knows, Ms. Cedar is on the ground at the foot of the stairs. So she's not very much help in trying to determine what happened and whether or not this was a tripped fall or something else happened. On the other hand, Mr. Rappanut, and I would strongly urge that the court read his testimony because he makes it clear that at the time that Ms. Cedar fell, she was on the stairs. She wasn't on the landing at the top of the stairs. And of course, it's on the landing where all the bricks are and the mortar and the caulk and everything else that the plaintiff has tried to focus on to support their case. But I could read you, I've got the transcript right here. It begins at the record joint appendix at 248. And in several instances, he makes it very clear that he was walking behind Ms. Cedar. She was taller than him. So normally he's kind of looking up. But there came a point and the last thing he remembers was he was looking at the top of her head. And then she disappeared from view. And he shifted his vision and she had fallen to the bottom of the steps. And so I went on and on with them and ask them, I go, what does that mean to you that she was on the steps? And he agreed. And I can't stress enough that that testimony is fatal to the plaintiff's claims because it takes out of play every single one of the defects that they've tried to focus on. And there's not much consistency there. There's some, we can get into that a little bit later if the court wants me to. But there was no defect identified on those stairs. They're made out of concrete and there's a railing for the use of invitees. And so if there's no defect, then the issue of constructive or actual notice is a moot point. There's no breach of duty. Mr. Hudgins, this is Judge Qualabong. I actually read all of the testimony and I recall the portions you're talking about. And I do think you're correct in describing that he viewed her as approximately his head level and she was taller than him. And I think your argument that that means she had moved from the landing into the steps, you can certainly make that argument. But I don't think he ever said, I saw that she had moved from the landing down there. That seems like your argument about his description of those events, which may be a very good one, by the way. But it seems like you might be attributing a little more certainty to his testimony than I read at least. Page 277 of the joint appendix. I'm going to quote it. As I testified, we were coming up from the lower level up the stairs. Davida was next to me. Camille was ahead of me and she was going down the stairs. Camille was ahead of me and she was going down the stairs. I can only recollect my field of vision, but I mentioned to them that she was going down the stairs and then she ended up on the sidewalk face down. Now, when she disappeared from your field of vision, was she on the stairs? And he insisted with that testimony on joint appendix at 278. And furthermore, at 286 and 287, it's very clear from this testimony that Miss Cedar was on the stairs. She wasn't on the landing. And so I think Mr. Sensenig has done a good job for his client trying to make a silk purse out of a case if she was not anywhere near the bricks that he's identified and focused on. Now, let me talk about the bricks for a while. Even if it could be argued that she tripped on something on the landing as opposed to the stairs, then we've got to focus on what it was. And the only testimony is probably the videotape that he wanted the district court to review. And I think he's provided it for your honors to review. I call it a jiggly brick. And it's a brick that moves around in its setting. It doesn't tilt up. It doesn't create a lip or a hazard or anything else. And it certainly wouldn't rise to the level of a hazard according to the line of Virginia cases that I've cited in my brief. There's a whole host of them that talk about, you know, defects in sidewalks and walkways. And they're all a lot worse than that jiggly brick. And so this is a case where the evidence just doesn't support the necessary elements of the Rappanut's testimony. But he makes it clear Cedar was on those steps, not on the landing. And I think it's, and if you try to make a case out of her tripping on something on the landing, the best you get is a possibility. And the cases make it very clear that that's not good enough when you're relying on circumstantial evidence. And certainly it's not good enough where there's another explanation that's equally as plausible than if there are two, and you all know the case law, that's the Marchant at 344 F Supp, second 497. Under Virginia law, if the proof leaves it equally probable that a bad result may have been due to a cause for which the defendant was not responsible as to a cause for which he was responsible, the plaintiff cannot recover. We can't ignore the testimony about her tripping on the stairs. People fall all the time, whether you know, they trip over their own feet, their shoes cause a problem or what have you, or she missed a step. But that can't be ignored, and if that's as reasonable an explanation as the one that the plaintiff is proposing, then the plaintiff cannot recover in this case. Well, let me ask you this, Mr. Huggins. Isn't that an argument for the jury? I don't think that on these facts, with this testimony, no reasonable juror could conclude that there's a dispute here. There just is not enough on the plaintiff's side to create a triable issue, and that's what Judge Hilton found, that the sum total of this evidence is not sufficient to create a triable issue. And so I would respectfully say no, Judge, this is not a case that ought to go to a jury. This is a case, you know, this testimony comes up and it comes out just as I've quoted from Mr. Rappanut, then this case would have to be thrown out at the motions phase after plaintiff's evidence, and there's no reason to waste everybody's time in that respect. And I, you know, Mr. Cincinnati has worked real hard for his client and everything, but from the beginning, he just didn't have the facts to support his case. And so I would respectfully request that Judge Hilton's ruling on summary judgment in favor of my clients be sustained. If the court has any questions about the facts, I'd be happy to answer. You know, the expert, um, it appeared to me that Mr. Cincinnati was trying to fill in some gaps in his evidence with expert testimony, uh, and create disputed facts with the use of expert testimony. I've never, I don't, I've never heard of anybody doing that, but certainly any testimony by the expert has to be based upon reliable facts. That was the subject of our motion to exclude Mr. Holland's testimony presented. Mr. Holland's testimony has not been excluded. There was no ruling on that, though. There was no ruling, Your Honor. But we can take that into account. You certainly can, and you can, and in your de novo review, I believe that you can look at the, um, at the motion, and it describes, um, it was supposed to be included as part of the joint appendix, and somehow it didn't make its way there, but it's in the record at 48 and 49, and it's, uh, the defendant's motion to exclude expert testimony, and it sets forth the reasons why Mr. Holland... The motion is not what we take into account. We can take into account his expert report. Would that be right? Um, well, if you do that, I would ask that you look at the motion and the arguments in the motion that I think go to the reliability of his report, because he, his facts were wrong. Uh, you know, he, he, um... No, but the district court didn't rule, didn't throw his report out. He didn't make, he didn't rule on the motion that you're talking about. Judge Hilton didn't think he needed to. Indeed, there was somewhere in there he relied on. Now, that I don't recollect. Well, I think that your friend on the other side there mentions it somewhere. We agree. Mr. Sensenig has it, but, um, certainly I think if, in your de novo review, you can certainly, um, you know, look at the reliability of any experts relied upon by one side or the other, and the motion would be a good way to, to review the, you know, the, the facts, uh, on that score. But, you know, there's a lot that Mr. Holland tried to do. He, he, the civil engineer, and he wanted to talk about, you know, the aging qualities of, of, uh, caulk in a sidewalk, and that, that was a stretch. Then he, then he submitted an affidavit, and he wanted to talk about how, you know, and he put together a whole, uh, recreation of, of Miss Cedar's fall, such that she scuffed her, you know, tripped over the, uh, pointed toe of a shoe and, and created a scuff on her foot. I don't know how far afield, uh, Mr. Holland was willing to go with his unsupported testimony. I, I don't believe that this court would find him to be a reliable expert in the least. But again, it's all moot if the fall was, you know, after Miss Cedar was already on the concrete stairwell where there are no or were no defects, then it's all moot that, uh, this case, you know, fails for, for lack of, of proximate cause on that basis. I think you all get the gist of how I feel about this case, and, you know, and I have enjoyed working with Mr. Sensenig, uh, and I wish that he had a better case in this instance, but it's just not there. Um, I thank you, gentlemen, for your time, and if there are any questions, I'll be there. Thank you. Thank you, Mr. Hutchins, for the kind words. I've enjoyed working with you as well, and look forward to hopefully continuing to work with you on this case. First, I'd like to address, um, the expert issue and Mr. Holland, and Mr. Holland, first of all, is a structural engineer. The district court did not rule on it. If you look at the bases for his opinions, the bases are photographs taken immediately after the accident. Again, as I stated in my opening, you can actually see the person there with the walkie-talkie. You can see the person tending to Miss Cedar. You can see the bloodstains. This is contemporaneous evidence. I don't, I don't know what else you would have an expert rely on other than photographs and video taken at that point. It's even better than surveillance video that you see, because surveillance video is grainy, always up, and half the time you can't even tell what's on there. If an expert can't rely on contemporaneous photographs taken at the time of video, then I don't know what any kind of expert could rely on as far as evidence. As far as the proximate cause issue and the testimony from Mr. Marapanat, there are a couple things there. Judge goes to, and I want to talk a little bit more about Mr. Marapanat's testimony and the evidence that's in concerning Mr. Marapanat, but even assuming all that, not looking at anything else, it still goes to whether there's a conflict and on the summary judgment, at the summary judgment stage, how those things are resolved. And I go back to Miss Buchanan's testimony, and we have cited that specifically in the record, and it was questions that were posed by Mr. Hudgens, and he asked her about the bricks, and his question, you know, trying to get to some kind of open and obvious argument that was not made, his question was, were they obvious to you that there was an issue there? And her answer was, they were more obvious to me because that was the area that she had just fallen from. She was behind. She looked immediately down. That's what she saw. That's credible evidence. It's very compelling circumstantial evidence. I think respectfully that Mr. Hudgens does go too far in his characterization of Mr. Marapanat's testimony. His testimony was she was going down the stairs. Well, if somebody's following me and I'm at the top of the stairs, they're going to say they're going down the stairs. That's where I'm headed. I'm going down the stairs. It doesn't mean that they actually had started down the stairs, and you could consider that top landing as part of the stairs. I think it is part of the stairs where the defect actually occurred. So I think it's a bit of a stretch. Look, he can make that argument to the jury, and I commend him for it, but it's absolutely a jury issue as to whether a jury wants to interpret Mr. Marapanat's testimony that she was going down the stairs as meaning she had already gone off that top landing, which is part of the stairs, and had gone down. And when you match that up with Ms. Buchanan's testimony that that is the area from which she fell, on summary judgment, it's very clear that there's sufficient evidence in the record to show that that is what caused her to fall. He brought up the scuff on the shoe, which is something I failed to mention at the outset. When Ms. Cedar was discharged from the hospital, she'd been in there for a while, and they gave her back her personal belongings. Her testimony was that she immediately noticed that there was a scuff on her shoe where there hadn't been one before. And so that is further evidence of the cause that she caught it on the lip. Again, if they want to argue to the jury some other things, they can certainly do that, but it's a case that goes to the jury. As far as Mr. Marapanat's testimony and going down the stairs, I'd also like to direct the court to the video. And we walked Mr. Marapanat through the video because he was talking, or at least in part, while the video was being taken, and he was very much supporting during that discussion that is on the video that your honors can review, that that area that they were showing with the loose bricks and the lip and the deteriorated cock was the area from which she fell. That's why they took the video of that area. That's why he was directing it as he was right there, further supporting the fact that in his mind, at the time, she hadn't crossed that threshold down to what you could call the first step or the second step or however you want to characterize it. I think to say, to take Mr. Marapanat's testimony that somebody was going down the stairs and say on summary judgment that precludes the trip at the top is there. If I could, just one second, please, your honor, take a look at my notes. And the same is true for the path. There was discussion about the path, and I did hit on this a lot, or hopefully a lot, in response to Judge Quattlebaum. I would ask the court to focus on what was happening at the time. Memories do change a bit over two years, and there was, during that testimony, and particularly with Mr. Marapanat, some back and forth. But once they looked at the pictures, in the end, they all came down to the same conclusion. Mr. Hudgens mentioned the fact that Ms. Buchanan, after she came back from a break, changed her testimony as to which lane it was in. Mr. Hudgens very specifically, and I want to point out to the court, very specifically asked her appropriately and in a consulted, why you changed your opinion? Did you talk to your lawyers during the break? And her testimony was very clear. She said, I did not speak with the lawyers. If you read through the record, what caused her to, during the deposition, clarify her testimony was when she saw the pictures taken from the date of the incident. The picture that she was initially shown was not taken from the day of the incident. I believe, your honors, it was taken by a defendant's expert some point later on. When she looked at the pictures that were taken, it refreshed her recollection. And again, it just hammers home the point that it's very clear where she fell, because you can see the blood stains at the bottom of that stairwell. And you can see the blood stains lining up with the dangerous defects. I submit to you that any argument as to which it went down is just noise and meant to distract. And again, Mr. Hudgens can try that with the jury, but it should not be compelling on a motion for summary judgment or on appeal for a motion for summary judgment. My time is almost up. Again, I really appreciate your time and attention to this matter and for allowing us to have oral argument on this and present this to you. Thank you very much, sir. We appreciate the arguments of counsel. We're sorry we can't come down to the well of the court and greet you. Maybe we'll do that next time. Madam Clerk, we will take this case under advisement and adjourn court until tomorrow morning. Thank you very much. Have a nice afternoon. Thank you all. This honorable court stands adjourned until tomorrow. God save the United States and this honorable court.
judges: Robert B. King, Henry F. Floyd, A. Marvin Quattlebaum Jr.